IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No. 1:20-CR-109      (MAD) |
| | ) | |
| **v.** | ) | **Plea Agreement** |
| | ) | |
| **YANG SUI,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant **YANG SUI** (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1)     <u>**The Defendant's Obligations**</u>:

    a)     **Guilty Plea:** The defendant will waive indictment and plead guilty to Count One of the information in Case No. 1:20-CR-109 (MAD) charging Theft of Trade Secrets, in violation of 18 U.S.C. § 1832(a)(1).

    b)     **Special Assessment:** The defendant will pay an assessment of $100.00 per count of conviction pursuant to 18 U.S.C. § 3013. The defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100.00, payable to the U.S. District Court, at the time of sentencing.

    c)     **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

    d)     **Restitution** The defendant will consent to entry of an order directing the defendant's payment of restitution in full to the following victim, whether or not the losses suffered by that victim resulted from the offense of conviction: the General Electric Company.

e)    **Forfeiture:** Pursuant to 18 U.S.C. §§ 1834 and 2323, the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegation in the information described above, all as more fully set out below:

(1)    All property belonging to the General Electric Company, including digital files created or owned by the General Electric Company.

(2)    All electronic devices under the control of the defendant containing digital files created or owned by the General Electric Company including, but not limited to:

(a)    A Lenovo laptop computer bearing serial number PB-ARDCG; and

(b)    A Seagate portable drive, model SRD00F1, bearing serial number NA98VP1Y.

(3)    All computer accounts, including cloud-based storage accounts, and e-mail accounts, under the control of the defendant containing digital files created or owned by the General Electric Company.

f)    **Access to Records:** The defendant will provide any privacy waivers, consents, or releases requested by the United States Attorney's Office to access records to verify the defendant's financial disclosures. The defendant authorizes the United States Attorney's Office to inspect and copy all financial documents and information provided by the defendant to the U.S. Probation Office.

g)    **No Transfer of Assets:** The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this plea agreement and/or that may be imposed

by the Court. In addition, the defendant promises not to make any such transfers in the future.

2) **The Government's Obligations:**

    **a)**    **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the information in Case No 1:20-CR-109 (MAD) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement. This agreement does not prevent the government from seeking charges based on other conduct. As of the time of execution of this Agreement, the government is not aware of any other conduct by the defendant that may form the basis of other federal criminal charges.

    **b)**    **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

    **c)**    **Release of the Defendant Pending the Sentencing Hearing:** The government agrees that provided the defendant does not commit any federal criminal offense or otherwise violate the terms of this Agreement, between the time of execution of this Agreement and the time of sentencing, the government will not oppose the defendant's request to be released on his own recognizance pending sentencing.

3) **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offense to which the defendant agrees to plead guilty and may be required to impose mandatory minimum terms of imprisonment, all as set out below:

    **a)**    **Maximum term of imprisonment:** 10 years, pursuant to 18 U.S.C. § 1832(a).

b) **Maximum fine:** $250,000, pursuant to 18 U.S.C. § 3571(b). The Court has discretion pursuant to 18 U.S.C. § 3571(b) & (d) to impose an alternative fine of the greater of $250,000 or twice the pecuniary gain to the defendant or loss to any victim resulting from the offense of conviction.

c) **Supervised release term:** In addition to imposing any other penalty, the sentencing court may require the defendant to serve a term of supervised release of up to three years, to begin after imprisonment. *See* 18 U.S.C. § 3583. A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to two years.

d) **Other adverse consequences:** Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4) **Elements of Offense:** The defendant understands that the following are the elements of the offense to which the defendant agrees to plead guilty. The defendant admits that the defendant's conduct satisfies each and every one of these elements.

a) *First,* the defendant stole information;

b) *Second,* the defendant knew the information was a trade secret;

c) *Third,* the information was, in fact, a trade secret;

d) *Fourth,* the defendant intended to convert the trade secret to the economic benefit of anyone other than its owner;

e) *Fifth,* the defendant intended or knew the theft would injure the owner of the trade secret; and

f) *Sixth,* the trade secret related to a product used in, and intended for use in, interstate or foreign commerce.

5)   **Factual Basis for Guilty Plea:** The defendant admits the following facts, and that those facts demonstrate the defendant's guilt for the offense to which the defendant is pleading guilty:

a)   Beginning in 2014, the General Electric Company ("GE") entered into a public-private partnership with the State University of New York's Polytechnic Institute. The partnership was known as the New York Power Electronics Manufacturing Consortium (NY-PEMC). NY-PEMC's purpose was to research, develop, design, and produce the next generation of semiconductors, specifically, silicon carbide metal-oxide semiconductor field-effect transistors (MOSFETs). GE invested over $100 million in NY-PEMC. GE's Global Research Center, headquartered in Niskayuna, New York, assigned a number of its research engineers to work for NY-PEMC.

b)   The defendant, who has a Ph.D. in electrical engineering, was employed by GE as a research engineer at GE's Global Research Center from approximately October 2010 to January 2018. GE assigned the defendant to work for NY-PEMC. Between January 2015 and December 2017, the defendant lived in Niskayuna, New York. During that period, in his capacity as a GE employee, the defendant performed work for NY-PEMC, related to silicon carbide MOSFETs, out of GE-controlled spaces inside the State University of New York's College of Nanoscience and Engineering's (CNSE) campus in Albany, New York.

c)   Silicon carbide MOSFETs are small electronic semiconductors / switches that regulate the flow of electricity through devices. GE's silicon carbide MOSFETs are used in a variety of products built by GE including wind turbines, solar inverters, medical imaging systems, and aviation equipment. Products containing GE's silicon carbide MOSFETs are placed in interstate and foreign commerce. GE's silicon carbide MOSFETs are superior to other silicon-only semiconductors / switches because GE's

5

silicon carbide MOSFETs use less energy and can endure higher temperatures, making them more efficient and durable than traditional silicon-only semiconductors / switches. Additionally, because GE's silicon carbide MOSFETs have the capacity to handle higher frequencies and temperatures than regular silicon MOSFETs, devices that contain GE's silicon carbide MOSFETs can operate with smaller cooling systems, resulting in space, weight, and energy savings. The unique capabilities of GE's silicon carbide MOSFETs give GE a unique competitive advantage in the MOSFET global market.

**d)**     Manufacturing a silicon carbide MOSFET involves approximately 200 steps. These steps, many of which GE developed and maintains as trade secrets, are exceptionally complicated.

**e)**     Between January 2015 and December 2017, GE took numerous physical and data security measures to protect, and keep secret, its intellectual property, including trade secrets relating to silicon carbide MOSFET technology such as the approximately 200-step manufacturing process. These security measures included:

(1)     Employing perimeter security at CNSE to prevent unauthorized persons from entering buildings in which research, design, and manufacturing of GE's silicon carbide MOSFETs was ongoing;

(2)     Employing building and room access measures such as card readers to prevent unauthorized persons from entering office spaces and clean rooms;

(3)     Requiring visitors to GE's spaces at CNSE to be badged and escorted by approved personnel;

(4)     Requiring employees to sign an "Employee Innovation and Proprietary Information Agreement" that explains how any innovations, technologies,

inventions, etc. that GE employees create while working for GE are the sole property of GE;

(5)     Requiring employees to be familiar with, and follow, GE's Acceptable Use of GE Information Resources policies which govern how to protect, safeguard, and use GE information, to include GE's trade secrets; and

(6)     Employing computer and network access controls that limit access to computers and file servers to those individual employees who have the necessary credentials, and have a legitimate business need to access GE's silicon carbide MOSFET files and materials.

f)      Beginning in 2015, the defendant, while working inside GE's space at CNSE, used his GE-issued computer to log onto GE's computer servers. The defendant, because of his position as a GE research engineer assigned to NY-PEMC, had access to restricted portions of GE's computer servers containing thousands of electronic files containing information about silicon carbide MOSFETs. While logged onto GE's computer servers via his GE-issued work computer, the defendant, on multiple occasions between 2015 and 2017, also logged onto his personal Google e-mail account (suiyang----@gmail.com) with his GE-issued work computer. On multiple occasions, the defendant stole, by downloading from GE's servers, and then uploading as attachments to e-mails via his Gmail account (suiyang----@gmail.com), dozens of GE's electronic files pertaining to the research, design, manufacture, and customer markets for silicon carbide MOSFETs. After sending the stolen information to himself via his Gmail account, the defendant repeatedly logged on to his Gmail account from his home in Niskayuna and downloaded the stolen GE files onto his personal laptop computer (a Lenovo laptop computer bearing serial number PB-ARDCG) or his personal external

storage device (a Seagate portable drive, model SRD00F1, bearing serial number NA98VP1Y).

**g)**   Beginning in about 2017, the defendant was developing a business plan to start his own private company whose purpose was to manufacture and sell the same type of silicon carbide MOSFETs that GE was researching, developing, designing, and manufacturing through NY-PEMC. The defendant was also looking for at least $30 million of outside funding to help his private company begin operation.

**h)**   The defendant knew that he was not authorized to steal, take, place, upload, download, possess, distribute, or use the aforementioned GE trade secret files, upload them to his Gmail account, or save them to his personal electronic storage devices. The defendant also understood that the theft, possession, and use of GE's trade secrets relating to its silicon carbide MOSFET technology would injure GE by causing GE to lose business, profits, and its competitive advantage in the market. The defendant also understood that the theft and possession of GE's trade secrets relating to silicon MOSFET technology violated intellectual property protection agreements he signed with GE including the "Employee Innovation and Proprietary Information Agreement" referenced above.

**i)**   GE learned of the defendant's thefts in mid-December of 2017. After discovering the thefts, GE's security staff interviewed the defendant on December 19, 2017. The defendant initially admitted that (i) he had moved one or two silicon carbide MOSFET files via his Gmail account, but that he did so only so that he could work on the files at home or print them out at home; and (ii) he did not retain any GE files on any personal devices. Upon further questioning by GE, the defendant admitted that he had moved more silicon carbide MOSFET files than initially stated, that he had vague plans to start

his own business, and that he had downloaded some of the stolen files onto his personal computer. The defendant also admitted that he took the stolen files without permission, and that the information in the files would be useful to him as he tried to start his own company to compete against GE by manufacturing and selling silicon carbide MOSFETs. During and immediately following the interview, GE preserved materials and electronic devices from the defendant's work desk on the CNSE campus and the defendant's Niskayuna residence.

**j)**     On December 21, 2017, investigators with FBI Albany executed a federal search warrant at the defendant's Niskayuna residence. During the search, law enforcement seized numerous electronic devices, including the defendant's personal Lenovo laptop computer and a Seagate external storage device. Forensic reviews of these devices indicated that the defendant used them to download and store dozens of stolen GE digital files containing trade secrets related to silicon carbide MOSFETs.

**k)**     On December 22, 2017, investigators with FBI Albany executed a federal search warrant at GE to search and seize office materials that GE's security staff had preserved from the defendant's work desk on the CNSE campus and electronic devices preserved from the defendant's Niskayuna residence. Included in these materials were some paper files and paper notebooks. One of the notebooks memorialized the defendant's plans to start his own company by producing silicon carbide MOSFETs. The seized materials show that the defendant was seeking $30 million in funding for a 50% ownership stake in his planned private company. The seized materials also show that the defendant was considering seeking a license from GE for the silicon carbide MOSFET technology, though the defendant had not yet discussed any potential license with GE because, soon after the defendant began

exploring the possibility of obtaining a license, GE came to his house and seized the materials, as described above.

**l)** In February of 2018, investigators with FBI Albany executed a federal search warrant on the defendant's Gmail account (suiyang----@gmail.com). Emails recovered from that Gmail account showed the defendant used it to upload and later download files containing trade secrets he stole from GE concerning GE's silicon carbide MOSFET technology.

**m)** Below are some of the GE files stolen by the defendant between January 1, 2015 and December 21, 2017 containing GE's trade secrets surrounding the design and manufacture of silicon carbide MOSFETs:

(1) A PowerPoint file named "SiC_Epiwafer-----------.pptx" containing six slides. The first slide had a title of "EPIWAFER EVALUATION PLAN REVIEW" and was dated June 22, 2016. The slides contained detailed information about GE's business plan for developing and using 150mm silicon carbide MOSFETs, as well as where to get vendors who could provide raw materials. A competitor of GE in possession of this file would save money and time in developing 150mm silicon carbide MOSFETs. All of the slides contained the warning "GE-CSNE CONFIDENTIAL".

(2) An Excel spreadsheet file named "1p7G3--------------.xlsx" containing detailed step- by-step instructions for manufacturing GE's silicon carbide MOSFETs.

(3) An Excel spreadsheet file named "7_26--------------.xlsx" containing detailed step-by- step instructions for manufacturing GE's silicon carbide MOSFETs.

(4)    An Excel spreadsheet file named "1.7KVGen.3 Process Specifications----------
---.xlsx" with multiple tabs containing the process flow needed to stand up a
chip fabrication process for silicon carbide MOSFETs.

(5)    A PowerPoint file named "SiC Non-Device-----------------Landscape & Cost"
containing seven slides, each marked "CONFIDENTIAL". The first slide had
a heading of "Sic Non-Device Wafer Landscape & Cost" and was dated
February 2015. The slides contained information and graphs about suppliers,
and costs, of raw materials necessary to manufacture GE's silicon carbide
MOSFETs.

(6)    An eight-page Adobe PDF file named "GE-------------45.pdf" marked
"Preliminary – GE Internal-Proprietary" containing charts, graphs, and
drawings that served as a data sheet for how GE's silicon carbide MOSFETs
would perform.

(7)    An Adobe PDF file named "SiC  update--------------2017.pdf". This file was an
Adobe PDF file dated July, 2017, and at the bottom of each page was the label
"GE Confidential". The first slide was entitled "SiC Horizontal Breakout Team
Update-July 2017". The file's charts, graphs, diagrams, and tables detailed in
which markets GE silicon carbide MOSFETs could be sold, the potential sales
volume, and the products into which the silicon carbide MOSFETs could be
used and applied.

n)    Each of these files—and numerous others stolen by the defendant—contained GE's
trade secrets relating to the research, development, design and manufacture of silicon
carbide MOSFETs. These trade secrets derived independent economic value, both
actual and potential, from not being generally known to, and not being readily

ascertainable through proper means by, the public. GE did not license or otherwise make its silicon carbide MOSFET technology available to the public or its customers. Moreover, GE did not license its silicon carbide MOSFET technology to the defendant.

**o)** The defendant is the owner of various e-mail accounts and electronic devices used to facilitate the offense of conviction, in that those e-mail accounts and electronic devices were used to transmit and store intellectual property, proprietary materials, and trade secrets stolen from GE.

6) **Sentencing Stipulations:**

**a)** The parties stipulate and agree that the base offense level for Count One is 6, pursuant to U.S.S.G. § 2B1.1(a)(2).

**b)** The parties stipulate and agree that the loss amount for purposes of U.S.S.G. § 2B1.1(b)(1) is at least $500,000.00, resulting in at least a 12-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(G). The parties agree that should the government or GE argue, at any time prior to sentencing of the defendant, that the loss amount is more than $500,000.00, or should the Probation Department calculate a loss amount in excess of $500,000.00, the defendant can seek an evidentiary hearing on the loss amount issue.

**c)** The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(a) if, (i) through the time of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense(s) to which the defendant is pleading guilty and all relevant conduct, as defined in U.S.S.G. § 1B1.3; and (ii) the government does not determine that the defendant, after signing this

agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. § 3C1.1.

**d)**   The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. § 3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 or more before receipt of any acceptance of responsibility adjustment under U.S.S.G. § 3E1.1(a).

7)   <u>**Waiver of Rights to Appeal and Collateral Attack:**</u> The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following (except that the defendant does not waive the right to raise a claim based on alleged ineffective assistance of counsel):

**a)**   The conviction resulting from the defendant's guilty plea;

**b)**   Any claim that the statute to which the defendant is pleading guilty is unconstitutional;

**c)**   Any claim that the admitted conduct does not fall within the scope of the statute;

**d)**   Any sentence to a term of imprisonment of 33 months or less;

**e)**   Any sentence to a fine within the maximum permitted by law;

**f)**   Any sentence to a term of supervised release within the maximum permitted by law;

**g)**      Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case.

**A.**      **<u>Right to Counsel</u>:** The defendant has a right to assistance of counsel in connection with settlement of this case and understands that right. Defense counsel has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

**B.**      **<u>Waiver of Trial-Related Rights</u>:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination. The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

**C.**      **<u>Court Not Bound by Plea Agreement</u>:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

**D.**      **<u>Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests</u>:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the

government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such recommendations, requests, and stipulations between the parties. If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

E.   **Sentencing:**

a.   **Maximum terms of imprisonment:** The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement. If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other. Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively. *See* 18 U.S.C. § 3584.

b.   **Sentencing guidelines:**

i.   The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act

and the United States Sentencing Guidelines promulgated thereunder. While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

ii.    Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court. Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

iii.   Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines. If the presentence investigation reveals that the defendant's criminal history may support an offense level different than an offense level stipulated in this agreement, the parties are not bound by any such stipulation as to the defendant's offense level and may advocate with respect to how the defendant's criminal history affects the offense level.

c.    **Factual findings:** The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

d.   **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence. In addition, the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding. For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements into evidence in any prosecution. If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement. To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

e.   **Government's Discretion to Recommend a Sentence:** Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from urging the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies; from recommending a specific sentence within the applicable guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence below or above the applicable guidelines range.

f. **Sentencing-Related Information:** The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. § 1B1.8. No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence. Neither party will use documentary evidence and/or witnesses at any sentencing hearing without first notifying the other party that it intends to use such documents and/or witnesses. The party that intends to use such documents and/or witnesses will provide the documents and, in the case of witnesses, the names of the witnesses, to the other party reasonably in advance of the sentencing hearing. The parties may provide any factual information relevant to sentencing to the Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report. The parties agree that the submission of such information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

g. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

a.  Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

b.  If the defendant is not a United States citizen, such conviction may result in deportation or removal from the United States, may bar readmission to the United States if the defendant leaves the country, and may result in a denial of a pending or future application for citizenship. If the defendant is a naturalized citizen, such conviction may result in denaturalization, followed by deportation or removal from the United States. Under federal law, removal or deportation may be an almost certain consequence of a conviction for a broad range of federal offenses, including, but not limited to, aggravated felonies, as defined in 8 U.S.C. § 1101(a)(43), and crimes of moral turpitude, which includes crimes involving fraud. Removal and other immigration consequences are the subject of a separate proceeding. No one, including the defendant's attorney and the Court, can predict with certainty the effect of the conviction resulting from this agreement on the defendant's immigration status. The defendant understands this uncertainty and nonetheless wishes to plead guilty regardless of any immigration consequences that the guilty plea may entail, even if the consequence is the defendant's automatic removal from the United States. Notwithstanding the forgoing, the government understands that the defendant has a daughter with autism and there is no effective treatment and/or inadequate support for autism in the defendant's place of citizenship (China). The government further understands that the defendant's two daughters are American citizens, and that the defendant's wife is a lawful permanent resident. The government further understands that the defendant does not have a prior criminal record, and that he has been a contributing member of society since emigrating from his place of citizenship to the United States in 2000.

c.    A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G.    **Restitution:** Independent of any agreement to pay restitution, and whether there is any such agreement, the sentencing Court may be required to order that the defendant pay restitution to any victim of the offense(s) of conviction under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. In addition, the sentencing Court may have the authority to order that the defendant pay restitution to any victim of the offense(s) of conviction pursuant to 18 U.S.C. §§ 3663 & 3664. The restitution payment will be in addition to any other civil or criminal penalty authorized by law.

H.    **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

a.    The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including substitute assets, as set forth above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

b.    The defendant consents to the entry of an order of forfeiture of the assets described above.

c.     The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents. The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court. The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

d.     Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture. Satisfaction of all, or any portion of, any restitution, fine, or other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

e.     In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party. The defendant agrees that forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

f.     The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

g.      The defendant waives the right to a jury trial on the forfeiture of assets. The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

h.      The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

i.      The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

j.      In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property. The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

I.   **Determination of Financial Condition and Payment of Interest and Penalties:**

a.      In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party.

b.   The defendant will promptly submit a complete, accurate, and truthful financial statement to the United States Attorney's Office, in a form it provides and as it directs.

c.   The defendant authorizes the United States Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

d.   Interest and penalties may accrue, as a matter of law, on any unpaid financial obligation imposed as part of the defendant's sentence, from as early as the date of sentencing.

**J.   <u>Remedies for Breach</u>:**

a.   Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part. In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

b.   If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

i.      To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement. The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement, notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

ii.     In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

iii.    To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

iv.     To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

v.      To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

vi.     To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

vii.    To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K.   **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant. References to "the government" in this agreement refer only to that Office. This agreement does not bind any other federal, state, or local prosecuting authorities. Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L.   **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M.   **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

GRANT C. JAQUITH
United States Attorney


*Richard Belliss*
Richard Belliss                                                4/15/2020
Assistant United States Attorney                    Date
Bar Roll No. 515295



YANG SUI                                                        04/14/2020
Defendant                                                        Date



Eric Yaffe                                                         4/14/20
Attorney for Defendant                                   Date
(*pro hac vice* to be filed upon docketing)

26